THE PEOPLE OF PUERTO RICO, Plaintiff and Appellee, v. RAMÓN FERNÁNDEZ GONZÁLEZ, Defendant and Appellant.

No. 5782. Argued November 27, 1935—Decided February 18, 1936.

*Carlos D. Vázquez* for appellant. *R. A. Gómez, Prosecuting Attorney,* for appellee.

MR. CHIEF JUSTICE DEL TORO delivered the opinion of the court.

The District Attorney of San Juan filed an information charging Ramón Fernández González with murder committed in Río Piedras on October 23, 1932, and consisting in the killing with malice aforethought of Carlos del Toro, a human

being. The defendant pleaded not guilty and demanded a jury trial. After a trial had on March 20, 1934, he was convicted of murder in the second degree. He moved for a new trial. The court denied the motion and on April 30, 1934, sentenced him to ten years' imprisonment in the penitentiary at hard labor. Thereupon he appealed, and in his brief he urges that the trial court erred in refusing to instruct the jury on voluntary manslaughter and on the legal effect of the willful suppression by the prosecuting attorney of certain evidence, in denying a motion for a new trial, and in sentencing him.

For a proper determination of the questions raised, it becomes necessary to summarize the evidence introduced by both parties at the trial.

The witnesses for the prosecution were Dr. Zengotita, Sinforoso Castro, Carmen Castro, Basilio Castro, Francisca Castro, Mateo Lorenzi, and Isabelo del Toro.

Dr. Zengotita made a *post-mortem* examination of Carlos del Toro who "presented a wound . . . . . about twelve inches long in the left scapulo-clavicular region." The cause of death was "a hemorrhage produced by the wound."

Francisca Castro was the wife of Carlos del Toro; Sinforoso, his father-in-law, and Basilio and Francisca, his brother and sister-in-law, respectively. All of them were at Sinforoso's house located out in the country, in the ward of Cupey of Río Piedras where Carlos was also living. Their testimony tends to show that between nine and ten o'clock at night on October 23, 1932, they heard Carlos returning. His wife opened the door for him and he said to her: "Wait a moment, I am going to smoke a cigarette," and when on the point of going up, the defendant, Ramón Fernández, approached him and with his machete inflicted on him the wound from which he afterwards died, leaving at once.

The other witnesses, Mateo Lorenzi and Isabelo del Toro, testified that in the afternoon of October 23, 1932, they were, together with the deceased, at defendant's house where sing-

ing and drinking was going on, and left about seven o'clock without any untoward incident. That the defendant followed them and that when crossing a brook he said to the deceased: "I want men to respect me," whereupon he attacked him with a club he was carrying. They intervened and stopped the dispute, taking the defendant, Isabelo, to his home.

The witnesses for the defendant were María Fernández, Francisco Fernández, Pablo V. Ríos, Gilberto Díaz, Jacinto Rodríguez, and the defendant himself.

María and Francisco Fernández are children of the defendant. The former, who was about fourteen years old at the time of the occurrence, testified that Carlos del Toro and his companions came uninvited to her father's house, where the latter was playing on a *"cuatro"* (a native stringed instrument). Carlos, who carried a dagger and had a bottle of rum in his pocket, told her father to play and when the latter refused "he got angry and got up and struck my little brother on the knee and suddenly stood up and grabbed me and told me to go out with him and have sexual intercourse with him . . . He began to use bad language towards father and the latter grabbed the crossbar . . . and struck him . . . Then the friends who accompanied him said: 'Don Ramón, go to bed as we are leaving,' and that is all I know."

Francisco, her brother, testified that when Carlos and his friends entered "father put the *'cuatro'* away seeing that he could not walk straight . . . . . He immediately took out a bottle of rum and offered a drink to father who refused . . . . He suddenly got up and kicked the bench and grabbed me and grabbed my little sister by one of her breasts and said to her, 'We are going to have sexual intercourse . . .' Father, at the sight of us crying, grabbed a crossbar and struck him . . . Then his friends who were with him said to him: 'Don Ramón, go to bed as we are taking him away,' and father went to bed and they took him away."

After his children the defendant himself took the stand, and testified that upon the arrival of Carlos and his friends

he put the instrument away. That Carlos sat down "and tried to force me to play . . . I refused to play . . . He sat down a moment thus . . . and kicked the bench and struck the little boy . . . He grabbed my little daughter and said to her: 'Come out with me to have sexual intercourse.' I grabbed a crossbar and struck him."

He stated that "he did not go with him . . . He stayed at the house . . . for about an hour . . . left to buy cigarettes and sugar in a shop . . . . and on his way there he heard Carlos insulting him and saw that he grabbed the dagger, saying to him, 'I am going to sentence you' . . . He struck me with his fist . . . and then I stepped forward and with an old machete, which I had with me as I had just been cutting wood, I had to strike him a blow in self-defense because I knew he was a dangerous man."

He related that on one occasion Carlos forced him against his will to play and on another broke a gourd (güiro) against his face. He said that Carlos was a "disorderly man. Wherever he was he would offend people, would respect nobody."

On cross-examination by the district attorney he denied having previously testified. The district attorney repeatedly called his attention to his testimony before District Attorney Quiñones on the day following the killing, but he only said that Carlos del Toro had hit him on the stomach with his fist and that he had gone to his home to sleep and did not go out at all that night, omitting any reference to the incident of his daughter and to the fight which he had just said had taken place when he had gone out to buy cigarettes and sugar, and he insistently denied having at all testified. The district attorney then submitted in rebuttal the testimony given under oath by the defendant on October 24, 1932, before Special District Attorney Quiñones. It was admitted with the acquiescence of counsel for the defendant.

The witnesses Díaz and Rodríguez testified regarding the reputation of the deceased. The former positively stated

that he was a boy who had grown up almost alone, quarrelsome, and the latter said: "I used to see him peacefully at work, but when he went on a spree he was not peaceful."

The testimony of Ríos, who was living with a daughter of the defendant, was to the effect that he had been with corporal Rivera on an investigation of the facts and had gone to the house of Sinforoso Castro where Francisca "stated in answer to my questions that her husband had called her and had said to her: 'Francisca, hand me a machete, this scoundrel has wounded me' . . . . .; that she had not seen the assailant because they were in bed at the time."

The defendant asked the court to give to the jury the following:

"INSTRUCTIONS

"1. An apparent danger of receiving great bodily injury which might so appear to a prudent man, justifies the plea of self-defense. *People* v. *Serrano*, 35 P.R.R. 309.

"2. In the instant case the district attorney failed to produce the witnesses Patricio Encarnación, Pedro L. Miranda, and Francisco Ramos who had been sworn, and it is a legal presumption that evidence willfully suppressed would be adverse if produced.

"3. Instruction on manslaughter.

"ORDER.—Instruction 1 granted. Instructions 2 and 3 denied, the former because the failure to produce witnesses does not always amount to a willful suppression of evidence, and the latter because nothing appears from the evidence to justify such instruction on manslaughter . . . . .

"INSTRUCTION

"If the jury reach the conclusion that Ramón Fernández killed Carlos del Toro in the heat of passion brought about by the language used by the deceased towards his daughter, María Fernández, then they should render a verdict of voluntary manslaughter.

"ORDER.—Instruction denied because the killing and the incident mentioned in the instruction did not follow each other closely in point of time."

The instructions given contain a summary of the evidence and ample information regarding murder and self-defense.

No reference is made therein to manslaughter. They conclude as follows:

"If from the evidence heard the jury believe beyond a reasonable doubt that the defendant, Ramón Fernández González, unlawfully killed Carlos del Toro with malice aforethought, but without any deliberate intent to kill, then it is the jury's duty to bring a verdict of second-degree murder.

"If you entertain any doubt as to whether the offense committed was murder in the first or in the second degree, then you must give the defendant the benefit of the doubt and convict him of the lesser offense.

"If from the evidence heard the jury believe beyond a reasonable doubt that in killing Carlos del Toro this defendant acted in self-defense, it is the jury's duty, in accordance with my instructions, to give the defendant the benefit of self-defense and to acquit him.

"And finally, if you believe from the evidence introduced that it was not the defendant who wounded Carlos del Toro, it is your duty, then, to find the defendant not guilty of the offense charged against him."

In a motion for a new trial counsel for the defendant insisted in his attitude in regard to the instructions to the jury. The court likewise insisted on its viewpoint, thus:

"The heat of passion that may be invoked by the defendant in order to reduce to manslaughter the crime of murder must be coetaneous with the fact of killing. Otherwise, there is premeditation. In the absence of evidence to justify an instruction on manslaughter, such instruction should be denied. In its instructions the court should not put into the jury's mind anything that is not supported by the evidence. To do otherwise would undoubtedly favor the accused, but it would lead to speculations and inferences not warranted by the evidence and might mislead the jury. The failure of the district attorney to call witnesses mentioned in the information who are in the court building and may be examined by the accused does not constitute a willful suppression of evidence. There is nothing to prevent the defendant from examining them in his defense. The district attorney may suppress cumulative and corroborative evidence as to facts already proven, and the accused has an opportunity to call and examine the witnesses for the prosecution

in his defense. The witnesses mentioned by the accused were in court and could have been called by him.''

We fail indeed to understand why the court that gave the jury such an ample instruction on self-defense should have refused to deliver to them the instruction which the defendant twice sought to have given on voluntary manslaughter.

Manslaughter is the unlawful killing of a human being without malice. It is voluntary when committed upon a sudden quarrel or heat of passion. (Section 203 of the Penal Code.) And what else than a sudden quarrel is that described by the accused as having taken place when he met again the deceased and was compelled, according to him, to use his *"mocho"* to defend himself?

It does not matter how incredible certain evidence may appear to the judge who conducts a trial before a jury. It is not his province but that of the jury to pass upon the credibility of the witnesses. It can not be maintained in this case that there was no evidence to warrant an instruction of manslaughter, and the refusal to give it under the circumstances is a prejudicial error. *People* v. *Rodríguez,* 35 P.R.R. 395; *People* v. *Crespo,* 21 P.R.R. 285.

Summing up the jurisprudence on the subject, Corpus Juris says:

''An instruction as to manslaughter should be given where there is evidence tending to establish that the homicide is of that grade. This is true, although the defense is, or the evidence tends to show, self-defense, and even though the theory of manslaughter is raised by defendant's statement alone; but it is not necessary that the testimony of accused be that which raises the issue of manslaughter. And where such issue is clearly involved, it is a fatal error for the court to fail or refuse to give such an instruction. Where there is a reasonable doubt as to the necessity of a charge on manslaughter, it should be resolved in favor of defendant.'' 30 C. J. 406.

''Where manslaughter and self-defense are both in issue and supported by the evidence, instructions on both issues should be given. Although self-defense is claimed or shown by the evidence,

an instruction on manslaughter should be given; and the court should also instruct the jury that, if self-defense is established, it renders the killing excusable and defendant should be acquitted altogether. But the instructions on the law of voluntary manslaughter and of justifiable homicide should be independent of each other, and be given in such a manner that the jury will understand where one issue ends and the other begins, and be able to draw the line of demarcation between them from the facts. An instruction on self-defense should not be blended with or given in immediate connection with an instruction on manslaughter, especially where self-defense has been charged in another instruction.'' 30 C. J. 418.

The error is rendered more serious by the fact that there was also involved in the case the question of the existence or nonexistence of a heat of passion.

It is true, as regards this point, that at first it seems inconsistent to advance at the same time the theory of the sudden quarrel that took place when the defendant, according to his testimony, on leaving his home to buy cigarettes and sugar met again the deceased, and that of the heat of passion.

We think, however, that in such cases the better practice is to submit the question to the jury under appropriate instructions so that they should render the proper verdict after considering the matter as a whole. Experience shows that in similar cases jurors, who ordinarily are good judges of human nature, usually render excellent verdicts.

Perhaps the jury, after receiving an instruction on manslaughter, would have rendered the same verdict of murder that they did render. Perhaps they might have found the defendant guilty of manslaughter, and disregarded the sudden quarrel and self-defense as something subsequently fabricated, and concluded that the accused had acted on the spur of the excitement caused by the insults inflicted on him by the deceased shortly before.

It was incumbent upon the jury to believe or not the testimony of the defendant and of his children. They might have fully believed such testimony and reached the conclu-

sion that the insults had been exceedingly grave, capable of producing a great perturbation of defendant's mind, and favored the theory of manslaughter, discarding the element of sudden quarrel. They might have considered as something subsequently fabricated and untrue the affront to the daughter and come to the conclusion that the defendant, the cup of insults received from the deceased having overflowed, decided to kill him and accordingly waylaid him near his home and slyly approaching him dealt him such a blow with his machete as to kill him, and favored the theory of murder.

"One accused of murder," says Ruling Case Law, summarizing the decisions, "if he would bring himself within the definition of the less heinous offense of voluntary manslaughter, must show that at the very moment of killing he was influenced by the passion induced by the deceased. Passion must have continued to exist until the commission of the homicidal act; if from any circumstances whatever, it appear, that the party reflected, deliberated, or cooled any time before the fatal stroke was given, or if in legal presumption there was time or opportunity for cooling, the killing will amount to murder, being attributable to malice and revenge, and not to mental disturbance. What constitutes 'cooling time,' as it ordinarily is termed, depends on the nature of man and the laws of the human mind, as well as on the nature and circumstances of the provocation, the extent to which the passions have been aroused, and the nature of the act causing the provocation, and therefore no precise time can be laid down by the court as a rule of law, within which the passions must be held to have subsided and reason to have resumed its control. The question is one of reasonable time, depending on all the circumstances of the particular case; and the law has not defined, and cannot, without gross injustice, define the precise time which shall be deemed reasonable, as it has with respect to notice of the dishonor of commercial paper. What constitutes a reasonable time in a particular case is ordinarily a question of

fact for the jury; and the court cannot take it from the jury by assuming to decide it as a question of law. Some courts hold, however, that when an unreasonable period of time appears to have elapsed between the provocation and the killing, then the court is authorized to say as a matter of law that the cooling time was sufficient. According to some of the decisions, the question is not alone whether the defendant's passion in fact cooled, but also was there sufficient time in which the passion of a reasonable man would cool. If, in fact, the defendant's passion did cool, which may be shown by circumstances, such as the transaction of other business in the meantime, rational conversations upon other subjects, evidence of preparation for the killing, etc., then the length of time intervening is immaterial. But if, in fact, it did not cool, yet if such time intervened between the provocation and the killing that the passion of the average man would have cooled and his reason have resumed its sway, then still there is no reduction of the homicide to manslaughter. Other courts, however, hold that the jury should be governed, not by the standard of an ideal, reasonable man, but should consider the question from the standpoint of the defendant in the midst of all the facts and circumstances.'' 13 R.C.L. 790–791.

Guided by the foregoing jurisprudence (that summarized on pages 785 to 797 of 13 R. C. L. should be studied) the district court could and should have submitted the question raised to the jury upon proper instructions to guide them in their verdict.

As to the assignment of error relating to the evidence claimed to have been wilfully suppressed, we are of the opinion that in view of the attendant circumstances the ruling of the court was correct.

A new trial, therefore, should have been granted for lack of proper instructions on voluntary manslaughter, and consequently the rendition of a judgment of conviction did not lie.

The judgment appealed from must be reversed and a new trial granted.

Mr. Justice Córdova Dávila took no part in the decision of this case.